UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOSEPH PALMISANO,              )
                                       )
             Petitioner,        )
v.                                  )          CIVIL ACTION
                                       )          NO. 15-13442-IT
OSVALDO VIDAL, Superintendent      )
Souza Baranowski Correctional       )
Center,                           )
                                       )
             Respondent.     )

# REPORT AND RECOMMENDATION ON
## PETITION FOR WRIT OF HABEAS CORPUS

January 19, 2017

DEIN, U.S.M.J.

## I. INTRODUCTION

The Petitioner, Joseph Palmisano, was convicted by a Middlesex Superior Court jury on February 10, 2011 of second degree murder and assault and battery by means of a dangerous weapon. He is presently serving a life sentence. Following his conviction, Palmisano filed a motion for post-conviction relief alleging ineffective assistance of trial counsel for failure to call an expert witness who was present at trial. The trial judge denied the motion without an evidentiary hearing. The appeal from this ruling was consolidated with Palmisano's direct appeal from his convictions. On May 14, 2014, the Massachusetts Appeals Court affirmed both the Petitioner's convictions and the denial of post-conviction relief. Commonwealth v. Palmisano, 85 Mass. App. Ct. 1119, 7 N.E.3d 1123, 2014 WL 1908632 (May 14, 2014) (table). (SA 208). The Supreme Judicial Court denied further appellate review. In this timely habeas petition, filed pursuant to 28 U.S.C. § 2254,

Palmisano asserts that trial counsel's decision not to call the expert witness deprived him of effective assistance of counsel, in violation of his Sixth Amendment rights.

For the reasons detailed herein, this court finds that the state court decision that there was no ineffective assistance of counsel, and that Palmisano had failed to establish prejudice, were not unreasonable applications of clearly established federal law. Therefore, this court recommends to the District Judge to whom this case is assigned that the petition for writ of habeas corpus be DENIED.

## II. <u>STATEMENT OF FACTS</u>[1]

### <u>Background</u>

On March 5, 2009, a grand jury indicted Palmisano on charges of murder, armed assault with intent to commit murder, and assault and battery by means of a dangerous weapon. (SA 1). The charges arose out of a stabbing death that occurred during a melee at a Somerville hotel. The case was tried to a Middlesex Superior Court jury (Whitehead, J.) beginning on January 24, 2011. Palmisano was represented by Attorney James Greenberg. On February 10, 2011, the jury convicted the Petitioner of murder in the second degree and assault and battery by means of a dangerous weapon, acquitting him of the charge of armed assault with intent to commit murder. (SA 3-9). Palmisano was sentenced to life imprisonment on the second-degree murder conviction, and to 4-6 years to run from and after the life sentence on the assault and battery conviction. (SA Ex. N (Sentencing) at 15).

---

[1] The Respondent filed the state court record, including transcripts, in a 3-volume Supplemental Answer ("SA") as Docket 14.

Represented by new counsel, Attorney Chauncey Wood,[2] Palmisano filed a Motion for Post-Conviction Relief on September 21, 2012, and requested an evidentiary hearing. (SA 14).  Therein, Palmisano raised the following claim:

> 1.    Mr. Palmisano was deprived of his constitutional right to the effective assistance of counsel because defense counsel's failure to call Dr. William Stuart as a medical expert to testify that the knife found in his possession could not have caused the fatal injury to the decedent Romeo Murray deprived Mr. Palmisano of an available and substantial ground of defense.

(Id.).  The motion was accompanied by affidavits of Attorney Greenberg, Dr. William Stuart and Dr. Elizabeth Laposata, an expert retained by defense counsel following the convictions.  (SA 17-32).  The motion was amended on or about March 11, 2013 to add a claim that "Counsel's failure to call a medical expert, after promising the jury he would do so, constituted ineffective assistance of counsel."  (SA 34).  The Commonwealth opposed the motion, and filed an affidavit of Adrienne C. Lynch, the Assistant District Attorney who tried the case.  (SA 174).[3]  The trial judge denied the motion without an evidentiary hearing on May 28, 2013, finding that the decision not to call the expert was "the exercise of tactical judgment" and that while "there was something to be gained by calling the defense expert, there was more to be lost."  (SA 170, 172).

Palmisano's appeal from the denial of his motion for post-conviction relief was consolidated with the direct appeal from his convictions.  On May 14, 2014, the Massachusetts Appeals Court issued an unpublished disposition pursuant to Rule 1:28,

---

[2]  Attorney Wood is also representing the Petitioner in connection with this habeas petition.

[3]  Although Palmisano does not refer to this affidavit, it was clearly part of the state court record and was referenced by the Commonwealth in its brief to the Appeals Court.  (See SA 143 n.2, 159). Palmisano filed a reply brief in response to the Commonwealth's Appeals Court brief.  (SA 192).

affirming the convictions and the denial of the motion for post-conviction relief. (SA 208). The Appeals Court also confirmed the trial judge's decision that no evidentiary hearing was necessary. (SA 209). Palmisano's application for further appellate review (SA 211) was denied by the Massachusetts Supreme Judicial Court on July 2, 2014. (SA 13). This timely habeas petition followed.

## The Underlying Crime

The Appeals Court did not provide much description of the underlying crime. Both parties to this habeas petition have provided descriptions of the events, with citations to the trial transcript. Except as otherwise noted, there are no significant differences between the parties' recitation of facts. Therefore, this court will borrow extensively from the parties' statements, with citations being to the volume and page of the trial transcripts.[4]

On January 16, 2009, Melissa Ring invited her cousin, petitioner Joseph Palmisano (also known as "JoJo"), her sometime boyfriend James Randall (a stabbing victim), Romeo Murray (the decedent), and several other friends to a party at the LaQuinta Hotel in Somerville. (V:5-7, 10). They arrived sometime in the evening and rented room 506. (V:12). Two nearby rooms, 508 and 516, were also rented for the purpose of holding parties. (IV:60; VIII:11-17). There was a great deal of drinking and some people smoked marijuana. (V:79, 128-29). Everyone became intoxicated. (IV:113).

At some point Randall invited his friend Andrew Dinisco to the party, which upset Ring because she did not like him. (III:68-71). After Dinisco arrived, Palmisano went up to Randall and told him that Dinisco had to leave. (III:73). Randall and Dinisco then left.

---

[4] The trial transcripts were filed as part of the Supplemental Answer at Exhibits B-M and will be cited as Trial Day:Page.

(III:74).  However, they did not get far, but rather joined the party going on in room 516, where Dinisco knew some of the people.  (III:78-80; IV:60).  The victim, Romeo Murray, was among those in the room.  (III:86).

Later that night, at 1:52 a.m., Ring called Randall, and Randall told her that he was still in the hotel, in room 516.  Ring was not happy at this news.  (III:88-90; IV:61; V:27). Minutes later, Palmisano and two other persons went to room 516 and knocked on the door.  (III:84).  Randall opened the door, at which point Palmisano asked if Randall was "disrespecting his cousin."  (III:84, 90-91).  Randall, Murray and Dinisco stepped out into the hall, and there was a "pretty loud" exchange of words.  (III:86, 92-93).  Nearly everyone from room 516 came out into the hallway.  (III:93).  A fight then broke out among as many as twenty-five people along the length of the hallway.  (III:96-97; IV:67; VI:151, 193; VII:22-23; VIII:18-19).[5]  According to Dinisco, he saw Palmisano and two others standing in the open doorway of room 506, and he made his way to the stairwell, went down the stairs and left the hotel.  (VI:68, 71-75).

Randall was in the area of room 516, fighting a group of eight to ten people.  (III:97-98).  He broke free and ran down to the end of the hallway, where he saw Murray being beaten aggressively by approximately ten people.  (III:97-101; IV:69-70).  He joined in the fight, during which he felt what he thought was a punch in his back.  (III:101-102).  He reached behind him, saw blood on his hand, and then realized that he had been stabbed.  (III:102, 123-24; IV:70-71).  Viewing the evidence in the light most favorable to the

---

[5]  There is evidence that this fight broke out because someone from room 516 made a racially disparaging remark to Murray, who was black, at which point Randall and Murray started the fight. (See Pet. Mem. (Docket No. 18) at 3-4).

Commonwealth, Randall turned and saw a man, with his back turned, heading away from him and the group.  (III:104).  He "immediately thought it was JoJo" based on his height, weight, hairstyle and coloring, which were "[e]xactly the same" as Palmisano's, as well the man's jeans, which had a distinctive "Ed Hardy" logo that nobody else was wearing.  (III:118, 113-16).  As a result, Randall concluded that Palmisano had stabbed him.  (III:147-48).

At this point, somebody cried out "[h]e got stabbed" or something similar and the fight broke up.  (III:119).  As the fight stopped, Randall observed Murray on the ground, wearing only a pair of basketball shorts and socks.  (III:119; IV:85).  Randall and Murray then walked back towards the elevator, which was across from room 516.  (III:124-26).  Randall encountered Christopher Flint, an occupant of room 516, and asked him to call 911 because he had been stabbed.  (VI:104-107).  Flint did so at 2:02 a.m.  (IX:138).  Immediately thereafter, Flint noticed a man walking towards the elevator wearing a grey sweater; according to Flint he was giving off "a bad vibe."  (VI:114-18).  Flint was scared and banged on the door of room 516, where he was eventually let in.  (VI:115, 117-18, 155-56).  The Commonwealth argued that this unidentified man was Palmisano, which the defense denied.  (XI:58-63).

Luis Rezendes, a friend of Palmisano's was serendipitously staying at the La Quinta in room 508.  (VIII:9-10, 16-17).  He heard a commotion from inside his room and looked out in the hall, where he saw a fight going on.  He did not recognize anyone, and went back into his room.  (VIII:16-19).  Rezendes testified that he then heard someone yell "JoJo," Palmisano's nickname, so he called Palmisano's cell phone, and the call went to voicemail.

(VIII:19-21).  Palmisano called Rezendes right back.  (VIII:21; IX:138).  He said Rezendes'

name a few times and then the phone was hung up.  (VIII:21-22).[6]

Rezendes then went into the hallway, holding a knife with its blade extended.

(VIII:22-23).  He saw Palmisano emerge from the crowd looking "distraught" or "agitated."

(VIII:25-26).  Rezendes pushed Palmisano into room 506, before returning to his own

room, 508.  (VIII:28-29).  Before going back into his room, however, Rezendes saw a man

holding his lower right back, saying "[h]e got me."  (VIII:28-29).  When he returned to his

own room, Rezendes told his girlfriend to hide his knife under the mattress, which she did.

(VIII:28-31).[7]

Palmisano stayed in room 506 for a brief period of time.  (V:34-39, 162-63; VII:24-

27).  While others did not see anything in his hands, Mallory White testified that Palmisano

had a knife in his hand, its blade extended, with what appeared to be blood on its blade.

(V:162-63; see VII:53-54).  Melissa Ring testified that when Palmisano came into room 506

he had his hands clasped in front of him, and he said "I have to get rid of this."  (V:36-37).

Although she did not know what Palmisano was referring to, she held out her hand and

said "[g]ive it to me[,]" to which Palmisano responded "no" "I won't have a female's hand

touch this."  (V:36-38).[8]  Ring confirmed that Palmisano was wearing the "Ed Hardy" jeans

---

[6]  Palmisano relies on the timing of these calls to argue that he was on the phone with Rezendes at the same time that Murray was being stabbed.  Flint called 911 about Randall at 2:02 a.m., Palmisano called Rezendes at 2:03 a.m., and a 911 call about Murray being stabbed, discussed infra, was made at 2:05 a.m.  (See Pet. Mem.  (Docket No. 18) at 7-8).

[7]  This knife was eventually recovered after the melee.  It is undisputed that there was no blood found on this knife.  (SA 146; X:26-28).

[8]  The record is unclear whether this statement was allegedly made after Randall was stabbed or after Murray was stabbed.  (See Resp. Mem. (Docket No. 21) at 4-5; II:63-64).  The difference is not significant as Palmisano denies stabbing anyone.

that Randall had identified, along with a shirt that matched his jeans and a hoodie.  (V:46-48, 105).  Palmisano left the room and did not return.  (V:39, 163-64).

Meanwhile, Randall and Murray pressed the elevator call button and entered the car when it arrived.  (III:126).  The doors closed, but immediately opened again.  (III:135).  Randall testified that as the doors opened, Palmisano reached in, extending his right hand forward in a thrusting motion, and stabbed Murray.  (III:135-36; IV:93-94).[9]  Murray was stabbed once in the chest, perforating his heart, and he later died.  (III:135; X:110).  Palmisano immediately ran away, and Murray stumbled out of the elevator and knocked on the door of room 516.  (III:137).  When the door opened, Murray asked for help, moved his hand from his wound so that blood spurted out, and fell to the ground.  (VI:158).  A few people in room 516 attempted to stop the bleeding, called 911, and helped Murray down to the lobby.  (VI:159-61; IX:138).  The 911 call was made at 2:05 a.m.  (IX:138).  At the same time Randall called Ring and told her that Palmisano had stabbed Murray.  (III:150; IX:138).  There was testimony from Stephen Merullo, one of the occupants from room 516, that while he was helping Murray someone came over to him in the hall and tried to hand him a knife.  (See VI:196-99).  Merullo did not identify the man, although the Commonwealth argued that it was Palmisano.  (See XI:66-67).  Palmisano argued that the description of the clothing worn by the man proves it was not him, while the Commonwealth argued that Palmisano was wearing layers of clothing which he removed through the course of the

---

[9]  Palmisano argues that Randall's eye-witness testimony about the events in the elevator was very unreliable, and points to various discrepancies in a number of witnesses' testimony.  (See Pet. Mem. (Docket No. 18) at 7, nn.5-6).  Similarly, Palmisano challenges the credibility of all witnesses who testified that they saw Palmisano with a knife, or that Palmisano admitted stabbing anyone, including Rezendes, his girlfriend, and Mallory White.  (See, e.g., id. at 5 n.3, 6 n.4, 7 n.6).

night.  (See Pet. Mem. (Docket No. 18) at 7-8 & n.7; XI:70-71).  Merullo's testimony, however, was not that clear and he could not identify the man in the hall.  (See VI:196-99).

Rezendes testified that approximately five to ten minutes after he had pushed Palmisano into room 506, Palmisano knocked on the door of Rezendes' room (room 508). (VIII:32-33).  When he came into the room, Palmisano was looking "lost" and "confused" and was holding a knife with a black blade in his hand.  (VIII:35-36).  Palmisano told Rezendes and his girlfriend, Jaclyn Covell, that "he [thought] he did something wrong" and that "he might have poked somebody[,]" which Rezendes understood to mean that he had stabbed someone.  (VIII:35-37, 146-47).  Palmisano stated that he needed to clean the knife he was holding, and retreated to the bathroom.  (VIII:37-41).  Rezendes did not hear any plumbing fixtures being used in the ten minutes that Palmisano was out of sight, but Covell did hear water running.  (VIII:41, 144-45).  It was later determined that, while there was blood in the sink, it did not match Palmisano, Randall or Murray.  (X:94).

Ring testified that as she was talking to the police in the hallway outside of room 507, Palmisano called her at 2:40 a.m., asked if the police were there, and told her not to mention his name.  (V:54-55; IX:140).  Later that morning, at 9:40 a.m., Palmisano inter-acted with a police officer on the fifth floor of the hotel.  (VII:94-97).  He told the police that he had spent the night in Rezendes' room, and that he hadn't heard any fight in the hallway. (VII:96-98).  Palmisano was already a person of interest at this point.  (VII:99).  Palmisano's girlfriend pulled up to the front of the hotel, and Palmisano got into the car, carrying a small duffel bag.  (VII:164).  Officers stopped the car, arrested Palmisano, and located a knife in the bag.  (VII:164-170).  Rezendes testified that the knife the police found was not the knife that he had seen Palmisano with, which had had a black blade.  (VIII:63-65).

Crime scene investigators examined the knife found in Palmisano's duffel bag, and did not locate any blood on it.  (X:47).  Murray's blood was found on the front right leg of Palmisano's pants, and the interior side instep of his right sneaker.  (X:8-9, 12-13, 73).  DNA testing of swabs taken from Palmisano's fingernails revealed a mixture of DNA from Palmisano and another source, but not Randall or Murray.  (X:94).

## Proceedings at Trial

Palmisano contends that counsel was ineffective by failing to call an expert witness who would have testified that the knife found in his duffel bag could not have been the knife that killed Murray because it was too short.  He argues that the problem was exacerbated because defense counsel had told the jury during his opening statement that the expert would be called.  The relevant facts are as follows.

## Arguments of Counsel

The defendant's theory of the case was that it was about "chaos at the LaQuinta Hotel" and a "rush to judgment" in the arrest of Palmisano based on the identification of James Randall, who was not credible because he was very drunk and had been involved in a big fight.  (See II:70 (opening); XI:25-26, 30-32 (closing)).  Thus, the defense argued, there were a number of other potential perpetrators who were never interviewed, and a great deal more forensic testing that could have been done to identify the location of the stabbing and the killer.  (See II:75-76; XI:29-30).  In support of this theory, defense counsel stated in his opening that knives were recovered from James Randall, from underneath the mattress of room 508, and from Palmisano's bag, all of which were tested by the defense and none of which could have inflicted the wound to Murray.  (II:73-74).  As defense counsel asserted in his opening:

There's a knife taken off James Randall at the hospital, covered with blood.  The defense had that knife tested.  The defense did.  And that knife, that blood was James Randall's blood.  And you'll see that knife and you'll see the blood still on it.

A knife was recovered from the mattress of 508, in between the mattresses.  A knife was recovered from Mr. Palmisano's bag.  All of them tested.  Mr. Palmisano's knife, no DNA on it, no blood.

**You'll hear from a defense expert.  None of those knives could have inflicted the wound to Romeo Murray.**  The length of the blade was too small and the handle, the expert will testimony [sic], a medical examiner, former medical examiner.
                                        . . . .

The police didn't do any investigation in this case.  They didn't check the hotel, they didn't check the laundry chute, they didn't check for any weapons.  They didn't check the surrounding perimeters.

(II:73-74, 75) (emphasis added).  In its opening, the Commonwealth stated that the police

found a knife in Palmisano's duffel bag when he was arrested, but did not assert that the

knife was the one with which the victim was stabbed.  (See II:67-68).

### Expert Testimony

During trial, the Commonwealth called Dr. Henry Nields, the Massachusetts Chief

Medical Examiner and a board-certified forensic pathologist, as a witness.  (X:95-135).  Dr.

Nields had performed the autopsy on Murray, and had determined that the fatal wound

was an estimated 5 ¾ inches deep, although he cautioned that it was only an estimate

because, as is usual, the body would have been in a different position when the wound was

inflicted than when the measurement was taken on the autopsy table.  (X:111-12).  Dr.

Nields opined further that the knife had penetrated the sixth intracostal space, and that it

had perforated the victim's heart.  (X:110).

Dr. Nields was further questioned by the Commonwealth as to whether a knife with a blade just three inches long (like the one found in Palmisano's duffel bag) could have caused the injury.  As he testified:

> Q:  Now can you tell us, Doctor, is it possible for a knife with a blade of three inches long to cause the injuries that you observed on Romeo Murray?
>
> A.  Yes.
>
> Q.  And can you tell us how that is possible?
>
> A.  Well, first of all with regard to the estimate as to the depth of the stab wound, again it's an estimate.  So it might not be five and three-quarter inches.  It could easily be less than that.
>
> Second of all, again, the body organs aren't necessarily in the same position during the time of the incident as they are at the autopsy table.
>
> And also, there is the ability to compress the rib cage, so that even though at the autopsy table you measured, the rib cage is at a certain level, it's possible during the stabbing incident for that rib cage to actually be, particularly in a younger person, to be depressed inward. So that is another explanation.

(X:113-14).  The Commonwealth concluded its direct examination of Dr. Nields by having him confirm that he was familiar with two publications: Forensic Pathology Principles and Practice, edited by Dolinak, Matshes and Lew, and Spitz and Fisher's Medicolegal Investigation of Death: Guidelines for the Application of Pathology to Crime Scene Investigation, edited by Werner Spitz, M.D., and that these publications were relied upon by forensic pathologists in the course of their work.  (X:120-121).  No other questions were asked about these publications.

During his cross-examination, defense counsel challenged the doctor's opinion that Palmisano's knife, with a 2 ½ inch blade, could have caused the wound.  (X:122-26).  On re-

cross examination, the Doctor admitted that the two other knives in evidence, which had

bigger blades, could also have caused the fatal wound.  (X:130-32).  The Commonwealth

then had the Doctor confirm that he could not exclude any of the three blade lengths as

having caused the injury.  (X:134).  No questions were asked about the treatises that the

witness had identified.  Thus, the sum of Dr. Nield's testimony was that he could not

identify the murder weapon, that any of the three knives found at the crime scene,

including Palmisano's, could have been the murder weapon, and that it was equally

plausible that none of the knives that had been recovered was the murder weapon.

### Dr. Stuart's Proposed Testimony

At issue in this habeas petition is whether defense counsel was ineffective by failing

to call the expert he had retained, Dr. William A. Stuart, who was present in the courtroom.

Dr. Stuart was an emergency room physician who had testified on numerous occasions as

an expert witness on stab wounds.  (SA 115 (Dr. Stuart Aff.) at ¶¶ 1-3).  According to

Attorney Greenberg, by the time of trial he knew that Dr. Stuart would testify that the knife

found in Palmisano's duffel bag could not have caused Murray's fatal injury because it was

too short to cause the deep wound, and that there could not be enough compression to

have caused a wound of that depth.  Dr. Stuart was also expected to opine that the design of

the knife would have caused a different shape wound, and that a thumb stud on the left side

of the blade would likely have left some sort of impression on Murray's skin, but there was

none.  He was also of the opinion that for the knife to have penetrated deep enough to

cause the wound, there would have been blood in the area where the blade attaches, but

there was none, and the blade was too wide to have caused the injury.  (SA 110-12

(Greenberg Aff.) at ¶ 8; SA 117-19 (Stuart Aff.) at ¶ 8).

Prior to trial, defense counsel had provided the Commonwealth with an email from Dr. Stuart in which he opined that "none of the knives in evidence could have delivered the fatal stab wound because they're not long enough, not wide enough, and could not have produced a 2 3/16 inch wide, 5 ¾ inch deep, stab wound to the left chest with a sharp edge and a blunt edge."  (SA 174-75, 178 (Lynch Aff.) at ¶ 2 & Ex. A).  According to the Commonwealth, upon learning of Dr. Stuart's opinion, the prosecutor, along with Dr. Nields, identified the two treatises (cited at trial) to support Dr. Nields' opinion that the wound could have been caused by a knife shorter than the wound.  (SA 174-77 (Lynch Aff.)).  The Assistant District Attorney explained that "[i]n court, I informed Attorney Greenberg of my intention to cross-examine Dr. Stuart with passages from these two learned treatises that corroborated Dr. Nields' opinion testimony and I had the excerpts in the courtroom if he wished to review them in advance of Dr. Stuart's testimony.  After Dr. Nields testified, Attorney Greenberg indicated that he was not sure he would be calling Dr. Stuart to testify." (SA 176-77).  According to Attorney Greenberg:

> After the Commonwealth rested, I decided not to call Dr. Stuart as a witness.  I have a general recollection that I feared the prosecutor would impeach Dr. Stuart's opinion with one of the treatises Dr. Nields referred to in his direct examination and there was a danger that this impeachment would weaken my case rather than strengthen it.  However, I did not review any medical treatises before making this decision.

(SA 114 (Greenberg Aff.) at ¶ 18).  Palmisano relies on this statement that Attorney Greenberg did not review the treatises as the pivotal fact in support of his claim of ineffective assistance of counsel.

### Closing Arguments

In his closing, defense counsel continued the theme that the case was about "chaos at the LaQuinta" and the resulting "rush to judgment with the arrest and charging of Mr.

Palmisano." (XI: 26). Defense counsel repeated his argument that the crime could have been committed by a number of other people, and that the police had failed to investigate either the people or the crime scene. (E.g., XI: 29-30, 37-38). He further continued to assert that Randall was not credible because he was very drunk and had just been involved in a huge fight, and that other witnesses were very drunk as well. (XI:30-34). With respect to the length of the knife, defense counsel used it to the defendant's benefit. In particular, he argued that if the short blade was the murder weapon it would have had to have been stuck far into the victim, resulting in the victim's blood on the attacker's hands, and there was no blood found on Palmisano. (XI:46).

In its closing, the Commonwealth implicitly conceded that the knife that was found in the duffel bag was not used to kill Murray, but suggested that Palmisano had had another knife during the evening that he had been trying to get rid of.[10] As the Commonwealth argued, while people were trying to save Murray's life,

> what's Joseph Palmisano doing? Joseph Palmisano is trying to get rid of a knife. How do we know this? We know this because groups from three different rooms on the fifth floor all tell investigators, and come in here and tell you, that he either has something that he's trying to get rid of, has a bloody knife in his hand, or tells them that he's poked or stabbed somebody.
>
> Goes into 506. Mallory White says, I see a bloody knife in his hand, I think it's a bloody knife.
>
> And Manny Teixeira, what does he say? When Joseph came in the room, Mallory said, "He had a knife in his hand."

---

[10] The suggestion that Palmisano may have had another knife had been made during the testimony. Thus, defense counsel ridiculed the argument in his closing, which took place before the Commonwealth's closing. (See XI:43 ("Oh, and he [Rezendes] says the knife had a black blade. I mean, now they're saying Palmisano, I guess, had a few knives? Benihana or something?")).

What do we know from Melissa Ring, his cousin?  She has him holding an item cupped in his hand.  It's almost like a stance that she described.  It's almost like, it reminds me of, like, say, a golfer, like leaning forward slightly.

. . . .

What would we hear next?  He's in Room 508.  He's trying to get rid of the knife there, "Got to get rid of this thing.  I did something bad.  I think I poked somebody."

Jackie Covell [sees] him go in the bathroom, hears him running the water.

Two different groups of people, two different rooms.  Same observations in the immediate aftermath of the murder.

516, Steven Merullo, he's at the elevator.  He's trying to help somebody. And what happens?  The guy in jeans with the white shirt walks down and tries to hand him a knife.  He can't get rid of it with his friends.  He's tried to get rid of it in 506, he's tried to get rid of it in 508, now he's going to try to get rid of it with 516.

But what's very important, ladies and gentlemen, when you consider the credibility of Luis Rezendes, if Luis Rezendes was actually involved and felt that he had to do whatever the prosecution wanted him to say, why would he say that this knife, Exhibit 76, **"Oh, yeah, I recognize this as Joseph Palmisano's knife but this isn't the knife that I saw him with in my room; that knife had a black blade."  Well maybe that would explain why Mr. Palmisano was so quick to say, "Yeah, check my knife."**

But regardless, he had a knife he was trying to get rid of....

(XI:66-67) (emphasis added).

### Post-Conviction Proceedings

As noted above, Palmisano was convicted of second degree murder and assault and battery by means of a dangerous weapon.  New counsel was appointed, and retained a well-known forensic pathologist, Dr. Elizabeth Laposata, to review Dr. Stuart's opinion, the evidence underlying that opinion, and the medical treatises Dr. Nields referred to in his direct examination.  (SA 30 (Dr. Laposata Aff.) at ¶¶ 5 & 6).  Dr. Laposata confirmed Dr.

Stuart's opinion that Palmisano's knife found in his duffel bag "did not cause Mr. Murray's fatal injury." (SA 31 (Dr. Laposata Aff.) at ¶ 9). In addition to agreeing with all of Dr. Stuart's reasoning, Dr. Laposata added that since Murray was not wearing a shirt, it was "virtually certain" that the thumb stud on the knife would have caused an abrasion or contusion on Murray's skin. (Id. at ¶ 11; SA 32). Moreover, since Murray was standing in the middle of the elevator, and not leaning against a wall, it "would have made it more difficult for the assailant to compress his rib cage sufficiently to permit a 2 ½ to 3 inch blade to pass through his chest and cause a 5 ¾ inch deep stab wound." Id. at ¶ 12. Thus, Dr. Laposata apparently concurred with Dr. Stuart that none of the knives recovered at the scene could have caused the fatal wound. Finally, Dr. Laposata attested that "I carefully reviewed the relevant sections of the textbooks cited by Attorney Wood [defense counsel]. They do not contain any information that undermines my opinion." (SA 32 (Dr. Laposata Aff.) at ¶ 13).[11]

As noted above, Palmisano filed a motion, and supplemental motion, for post-conviction relief, arguing that it was ineffective assistance of counsel to fail to call Dr. Stuart to testify. The trial judge heard the motion, and ruled without holding an evidentiary hearing, finding that "[t]he affidavits are not in conflict" and that "[t]he Court will accept as true all of the facts contained therein." (SA 170). As the trial judge ruled:

> The motion is grounded solely in a claim that trial counsel was ineffective by virtue of failing to call as a witness an expert who was available to the defense and who would opine that the knife found in the possession of the defendant on the day following the killing could not have been the weapon that inflicted the fatal wound. It is asserted that the failure was

---

[11] Palmisano interprets this statement to mean that "Dr. Laposata offered an uncontradicted affidavit making it clear that the publications did not support Dr. Nield's opinion." (Pet. Reply Mem. (Docket No. 28) at 1-2). This is an overstatement of Dr. Laposata's affidavit.

aggravated by the fact that counsel, in his opening statement, had alluded to the expert's expected testimony.

Given that the witness in question was in the courthouse at the time that the decision was made not to call him, that decision clearly involved the exercise of tactical judgment and was not the result of oversight. "Where a defendant challenges tactical decisions of his counsel, he must demonstrate that the decision was 'manifestly unreasonable'" in order to succeed on a claim of ineffective assistance." Commonwealth v. White, 409 Mass. 273 (1991). Only "'strategy and tactics which lawyers of ordinary training and skill in the criminal law would not consider competent' are manifestly unreasonable." Commonwealth v. Zagrodny, 443 Mass. 93, 98 (2004) (citations omitted).

As the case developed at trial, a major thrust of the defense was that there were many potential perpetrators other than the defendant and that at least two of them, in addition to the defendant, were found to have had knives in their possession at the time of the killing. While the testimony of the defense expert would have challenged the testimony of the Commonwealth's pathologist that the defendant's knife could not be ruled out as the murder weapon, it is evident that on cross-examination of the defense expert, his testimony would be undercut and the testimony of the Commonwealth's expert would be bolstered to some degree by treatises that would be used to impeach him.*  That, apparently, was the thinking of trial counsel, although he had not read the actual treatises.

> *That is not to say that the defense testimony would be totally undercut, because the defense expert would have made points that were not addressed in the treatises, nor even in the testimony of the Commonwealth's pathologist.

If that were the end of the story, counsel's judgment might fairly have been questioned. However, the defense expert was of the opinion that *none* of the knives recovered from those who were present near the scene of the killing could have been the murder weapon. The Commonwealth had been made aware of the fact through reciprocal discovery. It would certainly elicit that opinion from the expert on cross-examination. Doing so, it would significantly undermine the defense suggestion that the two other possessors of knives were equally as likely as the defendant to have inflicted the fatal wound.

There was one other factor to be considered: Proof that the knife found in the defendant's possession was the murder weapon was not essential to the Commonwealth's theory of the case. The defendant had had an opportunity to dispose of the incriminating evidence before his arrest and, in fact, had disposed of some articles of clothing that arguably

identified him as the killer.  He could have disposed of a knife.  In fact, in its closing argument, the Commonwealth omitted any suggestion to the jury that the knife in the defendant's possession was the murder weapon. Instead, it implicitly conceded that it might not have been the weapon. (Tr. XI, p. 67).

Thus, although there was something to be gained by calling the defense expert, there was more to be lost.  In that circumstance, the Court is unwilling to say that the decision not to call the expert was "manifestly unreasonable" or that it prejudiced the defendant by depriving him "of an otherwise available, substantial ground of defense."  Commonwealth v. Saferian, 366 Mass. 89, 96 (1974).

The defendant contends that, if the decision not to call the expert was not in itself reflective of ineffective assistance of counsel, trial counsel's allusion to the testimony in his opening statement, combined with the failure to call the witness was ineffective.  The allusion was as follows: "You'll hear from a defense expert.  None of those knives could have inflicted the wound to [the murder victim.]  The length of the blade was too small and the handle, the expert will [testify], a medical examiner, former medical examiner . . ."  (Tr. II, p. 74).  The comment was hardly the centerpiece of the opening statement, nor did it suggest that the expert testimony was the centerpiece of the defense case.  Moreover, ten days of trial separated the comment from the submission of the case to the jury. Given that fact, and given the strong admonition to the jury from the Court at the conclusion of the case that the opening statements "didn't matter any more," there is very little likelihood either that the jurors recalled the comment or that, if they did, the failure of counsel to follow through on his representation worked to prejudice the defendant. Contrast Anderson v. Butler, 858 F.2d 16, 18-19 (1st Cir., 1998) (Comment by counsel in opening statement regarding testimony of prospective expert witness, whom counsel then declined to call on the following day, went to core of the defense and was likely noted by the jury).

(SA 170-73).

Palmisano appealed to the Appeals Court.  That court rejected his argument that "trial counsel was ineffective for not calling an expert that he had retained, and for telling the jury in his opening statement that this expert would be testifying."  Palmisano, 2014 WL 1908632, at *1.  It also upheld the trial judge's decision to deny Palmisano's motion for a

new trial without holding an evidentiary hearing.  Id. at *2.  The Appeals Court granted

substantial deference to the trial judge's determination since, "[h]aving presided over the

trial himself, the judge was in a position to assess the potential impact of the expert's

testimony and to understand defense counsel's reasons for not calling the expert."  Id. at *1.

As the Appeals Court held:

> The Commonwealth's expert had testified that the blade on the defen-
> dant's knife, although much shorter than the depth of the fatal stab
> wound, could not be discounted as the murder weapon.  Trial counsel
> then chose to focus on the theory that there were several others who
> might have committed the crime, as there were others present who
> possessed knives with blades similar in length.  Counsel made a point of
> eliciting testimony from the Commonwealth's expert that supported this
> theory.  The defense expert's testimony that the defendant's knife was too
> short to have been the murder weapon would have undercut this theory
> because it necessarily would have excluded any other knives with blades
> similar in length.  Deciding not to call the expert at that point was not
> manifestly unreasonable.[1]  See Commonwealth v. Montez, 450 Mass. 736,
> 753–755 (2008) (decision by trial counsel not to call witnesses who
> would have undermined principal defense theory was not manifestly
> unreasonable).
>
> > FN 1: The defendant makes much of counsel's statement in his
> > affidavit that he was worried the defense expert would be impeached
> > by the use of treatises that the Commonwealth's expert had
> > referenced in his testimony.  As the judge noted in his decision below,
> > we might question counsel's decision, which he admits he made
> > without reading these treatises, if there was nothing more to the
> > story.  However, even though counsel does not explicitly state this
> > reason in his affidavit, the record clearly indicates that the defense
> > expert's testimony would have been subject to damaging cross-
> > examination that would undermine the theory defense counsel had
> > chosen to pursue.  See Commonwealth v. Lucien, 440 Mass. 658, 670
> > (2004) (although counsel did not explicitly state certain tactical
> > reasons in his affidavit, it was clear that testimony of defense expert
> > that counsel chose not to call would not have been helpful).
>
> Moreover, counsel's decision not to call the expert did not deprive the
> defendant of an otherwise available, substantial ground of defense.  See
> Commonwealth v. Saferian, 366 Mass. 89, 96–97 (1974).  As the judge
> noted, "[p]roof that the knife found in the defendant's possession was the
> murder weapon was not essential to the Commonwealth's theory of the

case."  In fact, in its closing, the Commonwealth did not argue that the knife found on the defendant was the murder weapon.  The defendant had the opportunity to dispose of evidence before his arrest, and the testimony indicated that he might have disposed of another knife that he had used that night.  Additionally, a witness testified that he had seen the defendant stab the decedent; there was testimony that the defendant had admitted that he stabbed someone; and the decedent's blood was found on the defendant's pants and shoe.  We therefore cannot say that the verdict would have been different but for the alleged error by defense counsel.  See *Commonwealth v. Salcedo,* 405 Mass. 346, 350–351 (1989).

Id.

The Appeals Court went on to hold that it was not error to conclude that counsel was not ineffective for referencing the expert in his opening and then not following through.  As the Appeals Court ruled, this reflected a tactical decision reflecting an adjustment of strategy based on the evidence at trial.  Id. at *2.  Moreover, the Appeals Court accepted the trial judge's reasoning that it was unlikely that the jurors remembered the comment or gave it great weight in that the statement in the opening was very brief, and more than ten days had passed before the case was submitted to the jury.  Id.  Finally, the Appeals Court found that it was not abuse of discretion not to hold an evidentiary hearing since there were affidavits, the affidavits were not in conflict, the trial judge accepted the affidavits as true, and he had his own knowledge of the trial.  Id.  The Court ruled that Palmisano had not shown that the affiants would have provided anything more in an evidentiary hearing, and, thus, it was "unclear how a hearing would have provided the judge with additional information relevant to deciding the motion."  Id.

Palmisano's application for leave to obtain further appellate review was denied by the Supreme Judicial Court without opinion.  This timely habeas petition followed.

Additional facts will be provided below where appropriate.

### III.  <u>ANALYSIS</u>

**A.      <u>Standard of Review</u>**

**1.      <u>Habeas Petition - Generally</u>**

The standard of review to be applied to Palmisano's habeas corpus petition is set

forth in 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty

Act of 1996 ("AEDPA").  The standard allows a federal court to grant a writ of habeas

corpus only if the underlying state court adjudication "(1) resulted in a decision that was

contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States; or (2) resulted in a decision that

was based on an unreasonable determination of the facts in light of the evidence presented

in the State court proceeding."  28 U.S.C. § 2254(d).  "This is a difficult standard to meet[.]"

<u>Barbosa v. Mitchell</u>, 812 F.3d 62, 66 (1st Cir. 2016) (and cases cited).  A writ of habeas

corpus is only appropriate "under the 'contrary to' clause if the state court applies a rule

different from the governing law set forth in [Supreme Court] cases, or if it decides a case

differently than [the Supreme Court has] done on a set of materially indistinguishable

facts."  <u>Bell v. Cone</u>, 535 U.S. 685, 694, 122 S. Ct. 1843, 1850, 152 L. Ed. 2d 914 (2002).  By

contrast, relief is proper "under the 'unreasonable application' clause if the state court

correctly identifies the governing legal principle from [Supreme Court] decisions but

unreasonably applies it to the facts of the particular case."  <u>Id.</u>  An unreasonable application

is more than just error, entailing "some increment of incorrectness beyond error[.]"

<u>McCambridge v. Hall</u>, 303 F.3d 24, 36 (1st Cir. 2002) (en banc) (citation omitted); <u>accord</u>

<u>Hyatt v. Gelb</u>, 840 F.3d 8, 12-13 (1st Cir. 2016); <u>Bell</u>, 535 U.S. at 694, 122 S. Ct. at 1850.  The

"increment of incorrectness beyond error" "must be great enough to make the decision

unreasonable in the independent and objective judgment of the federal court." Brown v. Ruane, 630 F.3d 62, 67 (1st Cir. 2011) (quoting McCambridge, 303 F.3d at 36). Moreover, under this analysis, "a state court is afforded deference and latitude." Hensley v. Roden, 755 F.3d 724, 731 (1st Cir. 2014) (citation omitted). "Thus, to obtain federal habeas relief, a petitioner must show the state court's ruling on the claim was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Hyatt, 840 F.3d at 12-13 (internal punctuation and citations omitted).

### Findings of Fact

With respect to factual findings, "the AEDPA sets out a separate and exacting standard applicable to review of a state court's factual findings." Pike v. Guarino, 492 F.3d 61, 68 (1st Cir. 2007) (citing, inter alia, 28 U.S.C. § 2254(e)(1)). Under § 2254(e)(1) there is a presumption that factual findings by the state court are correct, and the habeas court must defer to such findings. Sanna v. Dipaolo, 265 F.3d 1, 10 (1st Cir. 2001). "[A] habeas petitioner can rebut this presumption by adducing 'clear and convincing evidence'" that convinces the habeas court "that the underlying state court's adjudication 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding[.]'" Id. (citing 28 U.S.C. §§ 2254(e)(1) & (d)(2)); see also Teti v. Bender, 507 F.3d 50, 57 (1st Cir. 2007) (petitioner bears the burden of overcoming the presumption of correctness by providing "clear and convincing evidence" of the error).

As the First Circuit has recently noted, there is a tension between the standard of deference afforded findings of fact under § 2254(e)(1), and the language of 2254(d)(2),

which would require that the petitioner demonstrate only that factual findings were

"unreasonable." See Smith v. Dickhaut, 836 F.3d 97, 101 (1st Cir. 2016) (and cases cited).

The question of "precisely how section 2254(d)(2) and 2254(e)(1) fit together" remains

unresolved. Id. When a petitioner is not entitled to relief regardless of the standard

applied, the court need not decide the relationship between the two standards. Id.

## 2.    Ineffective Assistance of Counsel

The Appeals Court analyzed Palmisano's claim of ineffective assistance of counsel

under the standard set forth in Commonwealth v. Saferian, 366 Mass. 89, 96, 315 N.E.2d

878, 883 (1974). This standard is the "functional equivalent" of the federal standard found

in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). See

Lynch v. Ficco, 438 F.3d 35, 48 (1st Cir. 2006). As the First Circuit recently reiterated:

> Ineffective-assistance claims are governed by the Supreme Court's deci-
> sion in *Strickland v. Washington*, 466 U.S. 668 [104 S. Ct. 2052, 80 L. Ed.
> 2d 674] (1984), under which the defendant must prove two elements.
> First, the defendant must show that counsel's performance was deficient,
> which requires showing that counsel's performance was not only sub-
> standard, but also deficient in some way sufficiently substantial to deny
> him effective representation. Second, the defendant must show that the
> deficient performance prejudiced the defense, which requires proof that
> there is a reasonable probability that, but for counsel's unprofessional
> errors, the result of the proceeding would have been different.

Jaynes v. Mitchell, 824 F.3d 187, 196 (1st Cir. 2016) (quoting Logan v. Gelb, 790 F.3d 65, 71

(1st Cir. 2015) (per curiam)). Moreover,

> "[W]hen a federal court reviews an ineffective assistance of counsel claim
> under § 2254, it must use a doubly deferential standard of review that
> gives both the state court and the defense attorney the benefit of the
> doubt. This is an extremely difficult standard to meet...." *Pena v.*
> *Dickhaut*, 736 F.3d 600, 606 (1st Cir. 2013) (citations and internal
> quotation marks omitted). "[T]he pivotal question in a federal collateral
> attack under *Strickland* is not whether defense counsel's performance fell
> below *Strickland's* standard, but whether the state court's application of
> the *Strickland* standard was unreasonable, that is, whether fairminded

> jurists would all agree that the decision was unreasonable." *Jewett v.
> Brady*, 634 F.3d 67, 75 (1st Cir. 2011) (citations and internal quotation
> marks omitted).

Jaynes v. Mitchell, 824 F.3d at 196.

Applying all these principles to the instant case compels the conclusion that the

petition for a writ of habeas corpus should be denied.

### B.     The State Court's Decision Was Not An Unreasonable Application of Strickland

Palmisano contends that it was ineffective assistance of counsel for his trial attorney

not to submit the testimony of his expert witness on the "hunch that his expert witness

might be impeached."  (Pet. Mem. (Docket No. 18) at 17).  This court concludes, however,

that the state court's application of the Strickland standard, and its conclusions that

counsel's performance was not deficient and that the defendant was not prejudiced, were

not unreasonable.

### 1.     The Decision That Counsel's Performance Was Not Deficient Was Not Unreasonable

As the court held in Blackmon v. Williams, 823 F.3d 1088 (7th Cir. 2016), relied on

by Palmisano, "[i]f counsel has investigated witnesses and consciously decided not to call

them, the decision is probably strategic."  Id. at 1103 (quoting United States v. Best, 426

F.3d 937, 945 (7th Cir. 2005)).  And, as a strategic decision, it required "a balancing of the

benefits and risks of the anticipated testimony."  See Horton v. Allen, 370 F.3d 75, 86 (1st

Cir. 2004) (citation omitted).  This court must "start with the presumption that the

challenged action was sound trial strategy."  Id.  In the instant case, Attorney Greenberg

was aware of the proposed testimony of Dr. Stuart, and had arranged for Dr. Stuart to be in

the courtroom.  After hearing the testimony of Dr. Nields, he decided not to call his own

witness.  The state courts' conclusion that this was a reasonable tactical decision made by trial counsel is amply supported by the record.  See Tash v. Roden, 626 F.3d 15, 20 (1st Cir. 2010) (habeas petition claiming ineffective assistance of counsel denied where "once counsel had reviewed the expert's proposed testimony, declining to call him was a reasonable tactical judgment.").

On the other hand, Palmisano's characterization that trial counsel acted solely on a "hunch" greatly overstates the record.  As an initial matter, Attorney Greenberg attested that he had only a "general recollection" of the events at issue.  (SA 114 (Greenberg Aff.) at ¶ 18).  Moreover, he did not attest that his fear of cross-examination was the sole reason he did not call Dr. Stuart.  Rather, as the record makes clear, Attorney Greenberg made his decision after hearing the examination the Commonwealth's expert.  That testimony basically gave the defense much of the information it needed, without any of the risks of cross-examination.[12]  For example, Dr. Nields admitted that any, or none, of the weapons found at the scene could have been the murder weapon.  Through his cross-examination, defense counsel successfully weakened, if not eliminated, any argument that the weapon found in Palmisano's bag was the murder weapon beyond a reasonable doubt.  In fact, the Commonwealth conceded that it was not the murder weapon in its closing.  It was not unreasonable for the state court to conclude that the decision not to put on another witness to say the same thing was not ineffective assistance of counsel.  See Commonwealth v. Sena, 441 Mass. 822, 829, 809 N.E.2d 505, 512 (2004) (it was not ineffective assistance of

---

[12] As is obvious from Attorney Greenberg's affidavit, he was aware of the substance of Dr. Nield's testimony as well as of Dr. Stuart's proposed testimony at the time he made the decision not to call Dr. Stuart as a witness.  (See SA 110-14 (Greenberg Aff.) at ¶¶ 7-16).

counsel not to retain an expert where expert would not add to "what was already acknowledged by the Commonwealth's witnesses and conceded in the prosecutor's closing argument."); Harrington v. Richter, 562 U.S. 86, 111, 131 S. Ct. 770, 791, 178 L. Ed. 2d 624 (2011) (not ineffective assistance not to call expert witness: "[i]n many instances cross-examination will be sufficient to expose defects in an expert's presentation.").

Similarly, the state courts' assessment that there was a risk to the defendant in putting on the testimony of Dr. Stuart is amply supported by the record.  First of all, while Attorney Greenberg may not have read the treatises before he made his decision not to call Dr. Stuart as a witness, there is evidence in the record to support the conclusion that he was aware of the general contents of the treatises from his discussions with the Assistant District Attorney.  (See SA 174-77 (Lynch Affidavit)).[13]  Moreover, excerpts from the treatises were part of the record before the trial judge in connection with the motion for post-conviction relief.  As the treatises provided, "the depth of a knife wound frequently exceeds the length of the blade that caused it" and "stab wounds of six to seven inches in depth [can be] produced with a four-inch pocket knife."  (SA 181).  The treatises also provided that "once the tip of the blade has passed beyond the skin, the amount of force needed to penetrate inner organs is minimal[,]" and "the same, or a very similar, amount of force is required to inflict a deep or shallow stab wound."  (Id.).  While Palmisano objects to the fact that the state courts did not cite to the portions of the treatises they believed could

---

[13]  Palmisano argues that this court is limited to the express reasons detailed in Attorney Greenberg's affidavit in addressing his actions.  This is not correct, and it is appropriate for this court to evaluate counsel's conduct in the context of the case as a whole.  See Harrington v. Richter, 562 U.S. at 109, 131 S. Ct. at 790 ("Although courts may not indulge '*post hoc* rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions, neither may they insist counsel confirm every aspect of the strategic basis for his or her actions." (internal citation omitted)).

serve to cross-examine Dr. Stuart, they did not need to.  See Clements v. Clarke, 592 F.3d 45, 57 (1st Cir. 2010) (fact that state court's decision was brief, does not make it unreasonable).  There was ample evidence that their conclusion was correct.  Finally, Palmisano's argument that Dr. Laposata's affidavit established that Dr. Stuart's opinion would have been unassailable is not supported by the record.  The fact that Dr. Laposata concluded that the treatises did "not contain any information that undermines [her] opinion" does not mean that Attorney Greenberg was wrong to be concerned that there was a basis to cross-examine his expert.  (See SA 32 (Laposata Aff.) at ¶ 13).

It was also not unreasonable for the state courts to conclude that there was a risk in the defense putting on evidence that was designed to eliminate the possibility that any of the weapons found at the scene could have caused the fatal wound.  Palmisano takes exception to this conclusion on the grounds that it was not articulated by Attorney Greenberg, and because defense counsel allegedly did not argue at trial that Randall and Rezendes were equally as likely to have stabbed Murray.  (See Pet. Mem. (Docket No. 18) at 23; Pet. Reply Mem. (Docket No. 28) at 4-6).  As noted above, Attorney Greenberg could not be expected to articulate all his reasoning in his post-trial affidavit.  See note 13, supra.  The record is clear, however, that Attorney Greenberg had argued consistently throughout the trial that there could have been any number of perpetrators of the crime.  In particular, during the cross-examination of Dr. Nields he established that the knives that had been linked to Rezendes and Randall could have been used by the perpetrator as well.  (See X:130-32).  Similarly, in his closing, defense counsel argued that Rezendes may have stabbed somebody, leaving open the question as to the identity of his victim.  (See XI:44 ("Of course he's [Rezendes] got a knife, he's involved in the fight, he went out looking to

fight with a knife, by his own admission.  Did he stab someone?  Quite possibly.")  It was not

unreasonable for counsel to decide not to put on a witness who would definitely eliminate

suspects, including individuals who the jury may have focused on as likely wrongdoers.

See Harrington v. Richter, 562 U.S. at 111, 131 S. Ct. at 791 (sometimes the best strategy is

to argue that "there is too much doubt about the State's theory for a jury to convict.").  This

is especially true since Randall's and Rezendes' own guilty conduct could explain why they

both pointed the finger at Palmisano as the wrongdoer.  Finally, the record establishes that

Attorney Greenberg used Dr. Nields' testimony to Palmisano's advantage, arguing to the

jury that under Dr. Nields' theory, the knife had to be plunged in very deeply, and there

would have been blood on Palmisano, but none was found.  It was not an unreasonable

application of federal law for the state court to conclude that Attorney Greenberg's decision

not to call Dr. Stuart did not rise to the level of ineffective assistance of counsel.

    It also was not unreasonable for the state courts to focus on the fact that the

Commonwealth's case did not depend in any way on the knife in Palmisano's duffel bag

being the murder weapon.  In its closing, the Commonwealth conceded that there was

undoubtedly another knife that had not been found.  Putting on an expert witness to

confirm that there must have been another knife would not have addressed this critical

issue at all.  It also would have supported the Commonwealth's argument that Rezendes

should be believed when he testified that Palmisano had had another knife with him during

the melee.  In sum, it was not unreasonable for the state courts to conclude that defense

counsel's performance was neither substandard, nor "deficient in some way sufficiently

substantial to deny [Palmisano] effective representation." <u>Jaynes v. Mitchell</u>, 824 F.3d at

196 (citation omitted).[14]

### 2.    The Reference In The Opening Did Not Make Counsel's Representation Ineffective

Palmisano argues that the harm caused by the failure of defense counsel to call Dr.

Stuart as a witness was exacerbated by the fact that counsel mentioned that he would be

calling an expert in his opening.  The trial judge concluded that the passing reference in the

opening, followed by ten days of trial, made it unlikely that the jury would even remember

the statement.  The Appeals Court agreed, adding that the decision reflected an adjustment

of strategy based on the evidence at trial.  <u>Palmisano</u>, 2014 WL 1908632, at *2.  The

defendant has not established that these conclusions were unreasonable, and they are

based on an accurate assessment of the defendant's opening.  Moreover, for the reasons

detailed above, a jury could have easily concluded (if they had thought about it) that there

was no need to call a witness to testify that Palmisano's knife was not the murder weapon

since Dr. Nields had already testified to that effect.  This is simply not a situation where the

defendant promised to provide an expert witness whose testimony was critical to the

defense, and then failed to do so.  <u>Compare</u> <u>Anderson v. Butler</u>, 858 F.2d 16, 18-19 (1st Cir.

1988) (failure to call witness a day after express promise made in opening, which damaged

the defendant's primary defense, constituted ineffective assistance of counsel).

---

[14]  The Commonwealth also argues that there were additional grounds on which to cross-examine Dr. Stuart based on his credentials and other testimony he had given in other cases.  (<u>See</u> Resp. Mem. (Docket No. 21) at 20-21).  Since these grounds were not cited by the state courts, they will not be addressed further herein.

### 3.     The Decision That The Defendant Was Not Prejudiced Was Not Unreasonable

There is ample support for the state courts' conclusion that even if there was error on the part of defense counsel, the defendant failed to establish that he was prejudiced thereby.  Thus, the trial judge and Appeals Court concluded that Palmisano was not deprived "of an otherwise available, substantial ground of defense."  (SA 170-73).  Palmisano, 2014 WL 1908632, at *1.  To the extent that Palmisano wanted to argue that the knife in his duffel bag was not the knife that killed Murray, he could continue to do so.  As detailed above, Dr. Nields' testimony supported that conclusion.  Furthermore, there was evidence that forensic testing had established that there was no blood on the knife found in Palmisano's duffel bag, which could be compelling evidence that the knife was not used to stab Murray.  To the extent that Palmisano wanted to argue that there was a "rush to judgment" and the Commonwealth had failed to find the murder weapon, Dr. Nields' testimony could also be used to support this contention.  Furthermore, discrediting Dr. Nields' testimony to a greater degree than it had been discredited would not have addressed the Commonwealth's argument that Palmisano might have had a different knife.  In fact, it would have buttressed the Commonwealth's argument that Rezendes should have been believed when he testified that Palmisano had a different knife, and consequently lent more credibility to Rezendes' testimony.

Palmisano contends that the case against him "depended primarily on two pieces of evidence connecting Palmisano to Murray's death – (1) Randall's testimony that he saw Palmisano stab Murray and (2) the fact that Murray's blood was found on Palmisano's pants and shoe[,]" evidence which he describes as "not compelling."  (Pet. Mem. (Docket No. 18) at 24-25).  Even assuming, arguendo, that Randall's eye witness account of events was

"not compelling," in fact, there was considerably more evidence of Palmisano's guilt.  This evidence included, but was not limited to, the testimony of a number of witnesses who saw Palmisano with a knife; Rezendes' testimony that Palmisano admitted stabbing someone as well as his testimony that Palmisano had another knife; Palmisano's direction to his cousin not to tell police he was there; and Palmisano's decision to lie to the police about his where-abouts during the melee.  While a jury may have disbelieved all of this evidence, the fact that they elected not to do so was within their authority.  Palmisano has not established that there was a "reasonable probability" that if another witness had testified that the knife found in Palmisano's bag was not the murder weapon, the outcome of the trial would have been different.  See Strickler v. Greene, 527 U.S. 263, 291, 119 S. Ct. 1936, 1953, 144 L. Ed. 2d 286 (1999); Ouber v. Guarino, 293 F.3d 19, 25-26 (1st Cir. 2002) ("the possibility of a different outcome must be substantial in order to establish prejudice, [although] it may be less than fifty percent.").

### C.   Palmisano Is Not Entitled To An Evidentiary Hearing

Palmisano contends that the trial judge should have had an evidentiary hearing to further explore the reasons for Attorney Greenberg's decision not to call Dr. Stuart, as well as to determine whether the treatises legitimately could have been used to impeach Dr. Stuart's testimony.  (See Pet. Mem. (Docket No. 18) at 32-35).  The Appeals Court upheld the trial judge's decision not to hold an evidentiary hearing because it was "unclear how a hearing would have provided the judge with additional information relevant to deciding the motion." Palmisano, 2014 WL 1908632, at *2.  Similarly, there is no basis for an evidentiary hearing in connection with Palmisano's habeas petition.

In <u>Cullen v. Pinholster</u>, 563 U.S. 170, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011), the Supreme Court ruled that "evidence introduced in federal court has no bearing on § 2254(d)(1) review," because such review "is limited to the record that was before the state court that adjudicated the claim on the merits." <u>Id.</u> at 181, 185, 131 S. Ct. at 1398, 1400.  Thus, federal evidentiary hearings are prohibited where "the petitioner claims additional evidence beyond the state court record is necessary in order to show that he or she is entitled to habeas relief." <u>Sanchez v. Roden</u>, 753 F.3d 279, 307 (1st Cir. 2014). However, <u>Pinholster</u> "does not prohibit an evidentiary hearing once a petitioner has successfully shown the state court unreasonably applied federal law." <u>Id.</u>  Palmisano recognizes these principles, and contends that since "the record before the state court makes clear that state court's decision was unreasonable under § 2254(d)," an evidentiary hearing is necessary just "to establish[ ] that he is actually entitled to relief, given that his claim is based on affidavits (Attorney Greenberg, Dr. LaPosata, Dr. Stuart) rather than testimony that was tested by cross-examination." (Pet. Reply Mem. (Docket No. 28) at 10-12).  This argument is unpersuasive.

For the reasons detailed above, Palmisano has not established that the state court's decision warrants habeas relief under § 2254(d).  Accepting all of the affidavits as true, he has nevertheless failed to establish that the state courts were unreasonable in concluding that there was no violation of his constitutional rights.  Since Palmisano has not established a constitutional violation, there is no basis for an evidentiary hearing to establish that he is entitled to the relief sought.

## IV. **CONCLUSION**

For all the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the petition for writ of habeas corpus be DENIED.[15]


/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge

---

[15] The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985). Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).